UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHELLY ALLEN,

        Plaintiff,

Case No. 08-14106

Honorable Nancy G. Edmunds

v.

HENRY FORD HEALTH SYSTEM,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23]

This employment dispute comes before the Court on Defendant Henry Ford Health System ("Henry Ford")'s motion for summary judgment. Plaintiff Shelly Allen's complaint alleges that she was constructively discharged from her position as a Nurse Associate II in Defendant's Neurology department in March 2008 because of her race and asserts claims of race discrimination in violation of 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, *et seq.* Plaintiff's complaint also alleges claims of retaliation in violation of Title VII and Michigan's ELCRA. For the reasons stated below, Defendant's motion is GRANTED.

## I.  Facts

### A.  Plaintiff's Employment With Defendant

Plaintiff began her employment with Defendant Henry Ford Health System in November 2002 as a critical care nurse. (Pl.'s Dep. at 28.) In November 2003, Plaintiff voluntarily transferred to a Nurse Associate II position in the Pulmonary/Critical Care

department. (*Id.* at 28-29.)  In February 2006, Defendant eliminated this position due to a lack of grant funding.[1]  Plaintiff subsequently worked as a Nurse Associate II in the Neurology department.  (*Id.* at 57-58.)  Plaintiff claims in this lawsuit that she was constructively discharged from this position in the Neurology department in February 2008.

Plaintiff's job duties in the Neurology department were to provide nursing support to physicians conducting clinical research studies or tests in the field of neurology.  Her direct supervisor was Frances DeVos, Manager of Research Projects for the Neurology department.  (DeVos Dep. at 7, 9.)  Ms. DeVos's responsibilities include, among other things, making sure that the work loads of the eight clinical trial nurses under her supervision were cohesive with the smooth operation of the Neurology department. (DeVos Dep. at 8, 12.)  The decision as to which nurse to assign to a study is made by both Ms. DeVos and the physician responsible for that particular study.  (DeVos Dep. at 13.) Various factors are considered, including nurse/patient time, paperwork required, number of patients in a trial, and current phase of a trial.  (DeVos Dep. at 12.)

**B.  The February 2008 Reassignment of Studies**

On Thursday, February 14, 2008, Ms. DeVos sent Plaintiff and other Neurology department employees an e-mail informing them that certain studies assigned to research nurse Maria Nardicchio would be reassigned to Plaintiff and Lisa Pietrantoni, a research

---

[1]In January 2006, Plaintiff filed an EEOC charge of race discrimination alleging that her position had been eliminated because of her race; not because of the lack of funding.  The 2006 EEOC charge was settled, and Plaintiff's counsel stipulated on the record during Plaintiff's deposition that the facts surrounding her prior EEOC charge and subsequent settlement have no bearing on the claims asserted in this lawsuit.  (Pl.'s Dep. at 29, 47, 225.)  At the February 3, 2010 hearing, this Court rejected Plaintiff's counsel's belated and legally unsupported attempt to disclaim the earlier on-the-record stipulation on which Defendant had relied.

coordinator. (Def.'s Ex. E, 2/14/08 e-mail.) Specifically, Plaintiff was to take over the nursing portion of the studies; Ms. Pietrantoni was to take over the administrative portion of the studies; and Ms. Nardicchio was to be assigned all epilepsy-related studies. (*Id.*) The e-mail ended with a reminder that additional help would be provided if needed: "Everyone will let me know if the workload becomes too much and we will send in appropriate assistance." (*Id.*) There were a number of reasons for the reassignment, including an increase in the number of epilepsy trials, an effort to restructure and streamline the way studies were assigned to nurses, and a personality conflict between Plaintiff and Ms. Nardicchio (Plaintiff found her to be too "clingy"). (DeVos Dep. 21-24; Pl.'s Dep. at 73-78.)

On Friday, February 15, 2008, a meeting took place to discuss the transfer of studies. (Pl.'s Dep. at 98.) The meeting resulted in the following work assignments: (1) Plaintiff and Ms. Pietrantoni were assigned one study to work together, with Plaintiff performing the nursing duties and Ms. Pietrantoni performing the administrative duties; (2) Ms. Pietrantoni was assigned those studies that did not require nursing care; and (3) Ms. Nardicchio was assigned with the task of closing those studies that did not require nursing care. Plaintiff was not assigned the bulk of Ms. Nardicchio's studies. Rather, that burden fell on Ms. Pietrantoni. (DeVos Dep. at 32-33.) Dr. Varelas confirmed this in an e-mail to Plaintiff stating, "[m]y impression from the meeting was that not you, but Lisa [Pietrantoni], will take over. These are small unfunded studies anyway. Shouldn't provoke such turmoil . . . ." (Def.'s Ex. F, 2/26/08.)

As a result of the February 15, 2008 meeting, Plaintiff assumed that she was given five additional studies and assumed that this would be too much work for her to handle.

(Pl.'s Dep. at 99-101, 108, 136-37, 158-60.)   On Monday, Plaintiff flew to New Orleans for a work-related conference.  (*Id.* at 108.)  She returned to work on Monday, February 25, 2008.  (*Id.* at 112.)

## C.  Plaintiff's February 25, 2008 Letter of Resignation

On Monday, February 25, 2008, Plaintiff took her complaints to Dr. Alex Lowrey, Ms. DeVos's supervisor.  She told him that she felt the reassignment of studies was unfair and discriminatory.  Mr. Lowrey told Plaintiff that he would talk to Ms. DeVos and get back with Plaintiff.  (*Id.* at 112-13.)

Later that afternoon, Ms. DeVos called Plaintiff to her office.  It is at this meeting that Plaintiff claims she was constructively discharged.  She described the meeting with Ms. DeVos as follows:

> A:  I went in her office.  She closed the door.  She said I'm very – I spoke with Alex [Lowrey] and I'm very upset with what I heard.  She said, first of all, you don't have five new studies.  I said yes, I do.  She said no, you don't.  I said yes, I do.  She then – I said why would I have to take on all of Maria's work because she's not doing her job?  I've been telling you she hasn't been doing her job for the longest.  She said either take it or resign.  I said why would I take her studies?  And she said oh, you're resigning.  I expect your letter of resignation by the end of the day.  And I walked out of her office.

(*Id.* at 113-14.)

Plaintiff turned her letter of resignation in to Mr. Lowrey later that same day without any further conversation.  (*Id.* at 120, 122.)   Plaintiff's February 25, 2008 letter of resignation is addressed to the Department of Neurology and states:

> This letter serves as a two week notice of my resignation from the department.  After a discussion with management, regarding the transition of five new studies from Maria Nardicchio to Shelly Allen due to Maria's inability to perform her job adequately and effectively I am forced to resign from my position.  <u>I feel this action is discriminatory And [sic] unjustified and I cannot continue to work here</u>

4

under these circumstances.  I would like to thank the department and all the doctors for allowing me the opportunity to be a member of the neurology team.

(Def.'s Ex. K, 2/25/08 resignation letter (emphasis added).)   When asked to explain the highlighted language, Plaintiff testified that she had "asked for someone to look into my workload and I was fired."  (Pl.'s Dep. at 126.)

Plaintiff continued to work until her two week notice expired.  On February 26, 2008, Plaintiff sent an e-mail to physicians she had worked with in the Neurology department explaining what "caused her to resign."  (Def.'s Ex. I, 2/26/08 e-mail; Pl.'s Dep. at 129-33.) Plaintiff explained that she had been reassigned five new studies because Ms. Nardicchio was not doing a good job.  She "did not feel it was fair," and had asked Mr. Lowrey "why" she was "the only nurse who needs to cover 5" of Maria Nardicchio's studies.  (Def.'s Ex. I, 2/26/08 e-mail.)  Mr. Lowrey told her that he would get back with her, but he did not. Instead, Ms. DeVos had her come to her office and told Plaintiff  "in a very matter of fact way I either take the studies because Maria's plate was full or resign. So I resigned.  I could not take on this woman's work in addition to my own."  (*Id.*)

Plaintiff also made contact with Defendant's CEO Anthony Armada's office complaining that she was "forced to resign," and was referred to the human resources department.[2]  (DeVos Dep. at 65; Farquharson Dep. at 19-21, 27; D. Saoud Dep. at 11-25.) On February 29, 2008, Plaintiff personally met with Deborah Saoud, a senior human resources representative, telling her what had transpired since February 14, 2008.  When Saoud asked Plaintiff if she wanted to reconsider her resignation and attempt to work it out

---

[2]Plaintiff made a similar complaint about being "forced to resign" and complaints about racial discrimination in her exit interview.  (Farquharson Dep. at 33-35.)

with Ms. DeVos, Plaintiff told her that "her decision [to resign] was final." (Saoud Dep. at 19-21.)

Others also contacted Plaintiff about her resignation. On February 26, 2008, Dr. Varelas – the physician present at the February 15, 2008 reassignment meeting – asked her to "strongly reconsider [her] decision." (Def.'s Ex. F.) On February 28, 2008, Ms. DeVos told Plaintiff in an e-mail that she "did not want to loose [sic] a good employee, but believe[d] that [Plaintiff] had already made up [her] mind." (Def.'s Ex. N.) On March 3, 2008, in another e-mail, Ms. DeVos asked Plaintiff if she was in fact resigning:

> Shelly:
> Alex [Lowrey] and I will need to know if you are terminating your employment at Henry Ford so that correct codes are entered into the computer.

(Def.'s Ex. P, 3/3/08 e-mail.) Plaintiff did not respond to these e-mails and did not withdraw her letter of resignation.

On March 3, 2008, Plaintiff filed an appeal through Defendant's internal grievance procedure, claiming that she was forced to resign because of her race.[3] (Def.'s Ex. J, Employee Appeals Forms at 8-10.) Plaintiff's internal grievance was denied at each step of the process. (Def.'s Ex. J, Pl.'s 3/3/08, 4/18/08, and 5/22/08 Appeals Forms; Ex. Q, Mgmt. Appeal Resp. Form; Ex. M, 8/5/08 letter.)

On March 4, 2008, Plaintiff filed a charge of discrimination with the Equal Employment

---

[3]Defendant's human resources department was already alerted that Plaintiff was complaining about discrimination. Because her resignation letter complained of discriminatory action, Ms. DeVos promptly notified Nancy Farquharson, a senior employee relations specialist in Defendant's human resources department of that fact. (DeVos Dep. at 43-44; Farquharson Dep. at 17.) An investigation of Plaintiff's complaint of racial discrimination was conducted, and Defendant ultimately concluded that there was no evidence of discrimination. (Def.'s Ex. M, 8/5/08 letter.)

Opportunity Commission ("EEOC") alleging race discrimination and retaliation. (Pl.'s Compl. ¶ 25.) The EEOC ultimately dismissed Plaintiff's charges and refused her request for reconsideration. (Pl.'s Dep. at 207-08.)

Plaintiff's last day of work was March 7, 2008. (Pl.'s Dep. at 11.)

On September 25, 2008, Plaintiff filed this employment discrimination action against Defendant.

## II.    Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

### A. Race Discrimination

This matter is now before the Court on Defendant's motion for summary judgment arguing that Plaintiff cannot establish race discrimination with either direct or circumstantial evidence under Title VII or ELCRA. Claims of race discrimination brought pursuant to Michigan's ELCRA are analyzed under the same evidentiary framework as similar claims brought under Title VII. *Jackson v. Quantex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). A plaintiff seeking recovery under Title VII bears the burden of proving a prima facie case of discrimination by presenting either direct evidence of intentional racial discrimination or circumstantial evidence, following the *McDonnell Douglas*[4] burden-shifting analysis. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004). The Court first examines Plaintiff's claim that she presents direct evidence of intentional race discrimination.

### 1. Alleged Direct Evidence of Race Discrimination

Plaintiff argues that she has presented direct evidence of discriminatory animus by Defendant. The Sixth Circuit defines "direct evidence as evidence that proves the existence of a fact without requiring any inferences." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007) (internal quotation marks and citation omitted). "When a plaintiff

---

[4]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

establishes discrimination through direct evidence, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.* (internal quotation marks and citation omitted).

Plaintiff contends that the following comments made to her by her immediate supervisor, Ms. DeVos, are direct evidence that her termination was motivated by racial discrimination: (1) Ms. DeVos's statement to Plaintiff while passing her in the hallway that "I can flip my hair like that too;" (2) Ms. DeVos's statement that "we only hire blonds;" (3) Ms. DeVos's statement, in response to Plaintiff's request for a day off work to attend a court hearing, asking "is one day enough because I don't want you to return in shackles;" and (4) Ms. DeVos's isolated reference to Plaintiff as a "little girl" when speaking to her. (Def.'s Ex. Q, Mgmt. Appeal Resp. Form at 2; Ex. J, Employee Appeal Form at 9.) Defendant argues that none of these statements constitutes direct evidence of racial discrimination because (1) all were made at times remote from Plaintiff's alleged constructive discharge on February 25, 2008; and (2) multiple inferences are required to conclude that any of these statements are evidence of racial discrimination.

Applying the Sixth Circuit's definition for direct evidence, this Court agrees that none of these comments constitutes direct evidence of race discrimination. Each comment is ambiguous and inoffensive when viewed without the assistance of any inferences. "Because the evidence, if believed, does not require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions, the evidence does not suffice to establish a claim of [race] discrimination using direct evidence." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 239 (6th Cir. 2005) (internal quotation marks and citations omitted). "Further, even if the comment did in some way evidence

9

discriminatory intent, it fails to constitute direct proof of [race] discrimination because '[t]he critical inquiry . . . is whether [race] was a factor in the employment decision *at the moment it was made*.'" *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989) (emphasis in original)). Here, Plaintiff presents no evidence linking the challenged comments to the time she was allegedly forced to resign.

## 2. Disparate Treatment

Plaintiff likewise fails to defeat summary judgment on her claims of race discrimination using circumstantial evidence. To establish a *prima facie* case of employment discrimination under Title VII using circumstantial evidence, the plaintiff must show that (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position at issue, and (4) she was treated differently than similarly situated employees outside her protected class. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004).

If a prima facie case is established, the defendant can rebut the presumption of unlawful discrimination by setting forth a legitimate, non-discriminatory business reason for the challenged employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). Once this is done, the burden shifts back to the plaintiff to show that the articulated reason was a mere pretext for intentional race discrimination. *McDonnell Douglas*, 411 U.S. at 804. "A plaintiff can refute the legitimate, nondiscriminatory reason articulated by the employer to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (internal quotation and citation omitted).

Defendant argues that Plaintiff has not and cannot establish the second and fourth elements of her *prima facie* case; i.e., that she was constructively discharged or treated less favorably than similarly situated white employees.  This Court agrees.

### a.  Adverse Employment Action - Constructive Discharge

Plaintiff argues that her supervisor, Ms. DeVos, forced her resignation and thus constructively discharged her on February 25, 2008.  She further argues that this adverse employment action satisfies the second element of her *prima facie* race discrimination case.  Plaintiff fails, however, to present evidence showing that she was constructively discharged.

"To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit."  *Moore v. Kuka Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *see also Vagts v. Perry Drug Stores, Inc.*, 516 N.W.2d 102, 105 (Mich. Ct. App. 1994) (observing that to establish a claim of constructive discharge under Michigan law, an employee must show that his employer deliberately made his working conditions "so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." (internal quotation marks and citation omitted)).  Plaintiff has not persuaded the Court that a reasonable person in her shoes would feel compelled to resign when faced with the prospect of taking on the additional studies Plaintiff was assigned in February 2008.

Plaintiff argues that she was forced to resign when Ms. DeVos gave her the ultimatum of either taking on Ms. Nardicchio's studies or resigning. Specifically, Plaintiff presents evidence stating that she "was told in a very matter of fact way [that she] either take the studies because Maria's plate was full or resign. So [she] resigned." (Def.'s Ex. J, Employee Appeal documents at 3, 9, 10.) Plaintiff's February 25, 2008 letter of resignation similarly states that she resigned rather than comply with her supervisor's order to accept the reassignment of certain studies from another nurse.

> This letter serves as a two week notice of my resignation from the department. After a discussion with management, regarding the transition of five new studies from Maria Nardicchio to Shelly Allen due to Maria's inability to perform her job adequately and effectively I am forced to resign from my position. I feel this is discriminatory [a]nd unjustified and I cannot continue to work here under these circumstances. I would like to thank the department and all the doctors for allowing me the opportunity to be a member of the neurology team.

(Def.'s Ex. K, 2/25/08 Resignation Letter.) At her deposition, Plaintiff once again explained why she felt she was constructively discharged.

> Q: I just want you to say exactly what [Ms. DeVos] said that you felt she was terminating you, that meant she was terminating you.
>
> A: She told me I was going to do it or resign. I said, "Why would I do her work?" She said, "Then you're resigning. I'll expect your letter of resignation by the end of the day." That's what led me to believe that I was being fired.

(Def.'s Ex. A, Pl.'s Dep. at 128-29.)

Plaintiff presents evidence of this ultimatum but fails to present evidence that the reassignment of studies from another nurse to her was intended by her employer to make her working conditions so difficult or intolerable that a reasonable person in her shoes would feel compelled to resign. In fact, testimony from her deposition reveals that Plaintiff did not have knowledge of the facts necessary to confirm her assumption that more studies

12

meant more work and intolerable working conditions.

Q: Was it true that these were small unfunded studies?

A: I don't know what kind of funding those studies had. They had just been presented to me.

Q: So you didn't even know how much work they entailed?

A: No.

Q: That you were complaining about being overworked even before you understood how much work were in these studies?

A: I know all the 12 studies I had prior to that entailed a whole lot of work, so the new five I didn't think was any different.

Q: But just so I'm clear, you at no time made any effort to understand how much work these supposed five studies you were getting involved, right?

A: Well, I knew what some of them. They had some discussion in the office about what was going to be done, so about the work and how I was – the information was going to be gathered, so yeah, I had some idea of some of the work that was going to be involved, but did I have a total clear picture? No. But I knew it was new work, more work, for me.

* * *

Q: Do all studies require the same amount of time, same amount of your time?

A: No.

* * *

Q: So the fact that you have a number of studies – So the fact that you have ten studies, for example, and somebody else has ten studies, doesn't mean that you're both going to be equally busy just because you have ten studies, correct?

A: I would say that's correct, but ten studies with patients in all of them and they got zero in six of theirs, it would make a difference.

* * *

Q: I mean so really it depends upon what the study is, how many patients

they [sic] are, and what kind of paperwork and protocol you have to fill out, correct?

A: Exactly.

* * *

Q: So what did you know about the protocol, the paperwork, the amount of effort that had to be put into the studies that you claim that you were given at the meeting on February 15?

A: I know that every study that I have has required an immense amount of my time. . . . So I assumed the others would too.

(Pl.'s Dep. at 136-37, 158-60.)

Plaintiff resigned before she was able to determine whether these additional studies would, in fact, make her workload objectively intolerable. And, as the Sixth Circuit has observed, "[a]n employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged." *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002). "Instead, the employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Id.* (internal quotation marks and citation omitted) (citing cases). *Accord Davis v. Ford Motor Credit Corp.*, No. 3:04-0790, 2005 WL 2452601, **5-6 (M.D. Tenn. Oct. 3, 2005) (applying *Agnew* in a disability discrimination case and concluding that the plaintiff was not constructively discharged when she "did not give her new position a 'try,' but instead jumped to the conclusion that she could not do the job or that it would be too demanding on her physical limitations."). The evidence Plaintiff presents does not support a finding that she was constructively discharged.

Plaintiff likewise fails to present evidence that it was Defendant's intent to force her to resign. In fact, the evidence is to the contrary. During the two weeks between Plaintiff's resignation and her last day of work, she was given the opportunity to reconsider. She did

not do so.  (Def.'s Ex. N, 2/28/08 email from DeVos; Ex. P, 3/3/08 email from DeVos; Ex F, 2/26/08 email from Dr. Varelas; Ex. H, Lowery Dep. at 34; Saoud Dep. at 19-20.)

In light of the above, Plaintiff has not and cannot establish the second element of her *prima facie* case of race discrimination.  Even if this were otherwise, she has not and cannot establish the fourth element of her *prima facie* case; i.e., that she was treated less favorably than similarly-situated white employees.

### b.  Disparate Treatment

Plaintiff presents no evidence showing that similarly situated nurses outside the protected class were treated more favorably than her; i.e., that any nurse outside the protected class in the Neurology department was either (1) reassigned studies, refused to accept them, and was not given an ultimatum of accepting them or resigning, or (2) assigned a significantly lesser workload than Plaintiff and was never assigned additional studies.  (Pl.'s Dep. at 48-49, 71, 103-04, 107-08.)  In her response brief, Plaintiff fails to address this element of her *prima facie* case.  At her deposition, Plaintiff identified a number of white nurses who she claimed received less work than her; but, upon questioning, Plaintiff admitted that she had no personal knowledge of these nurses's workloads.  For example, Plaintiff admitted that she did not "know what other people were working on" when she first came to the Neurology department.  (*Id.* at 49.)  Plaintiff further admitted that, after working in the department for some time, she still had no personal knowledge of individual nurse's workloads.

Q: Well, after you started working there did you come to understand that some people work on strokes, other people work on epilepsy, other people work on other different kinds of areas?

A: Some, yes.

Q: Okay. What was the division of work, so to speak, among the people that were working on the research projects?

A: Most were specific to one area.

Q: Okay. And what were they specific to?

A: I don't know in detail, but I knew like some of the studies that they did. I didn't know all of them that they did.

(*Id.* at 58.) When asked to specify the number of studies assigned to individual nurses, Plaintiff could only identify the physician with whom each nurse worked. (*Id.* at 59-61.) Plaintiff's testimony reveals that she was merely speculating that she had more studies assigned to her than her co-workers. (*Id.* at 64-67.) Plaintiff's testimony also reveals that she believed she had more work than her co-workers since January 17, 2007; long before the February 2008 reassignment that precipitated her resignation. (*Id.* at 71.)

Plaintiff also failed to identify any nurse outside the protected class that was treated more favorably than she was under similar circumstances. Plaintiff testified that a white nurse, Sherry Payne, was treated more favorably than her because Ms. Payne transferred to another unit after complaining that she did not get a promised pay increase but was then allowed to transfer back into the Neurology department two months later despite her earlier complaints. (*Id.* at 193-94.) As Plaintiff conceded, however, Ms. Payne did not resign from her position like Plaintiff did. (*Id.* at 194.) Rather, she transferred out of the department and later transferred back. Plaintiff presents no evidence to suggest that she similarly sought but was denied a transfer.

As another example of disparate treatment, Plaintiff testified that another white, neurosurgery nurse, "Algy," complained about co-workers interfering with her work and stated that she "wanted to quit to her doctor, her head doctor;" and rather than simply

allowing her to do so, Defendant accommodated her by telling her co-workers not to bother her. (*Id.* at 194.)  Upon further questioning, Plaintiff conceded that Algy's complaints, unlike Plaintiff's, were not about additional work or complaints of disparate workloads.  In sum, Plaintiff cannot demonstrate that other non-protected nurses from the Neurology department that she claims were treated more favorably were similarly situated to her "in all *relevant* aspects."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in original).

For the above-stated reasons, Defendant is entitled to summary judgment on Plaintiff's race discrimination claims.  The Court now addresses Plaintiff's claims of retaliation.

## B.  Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in protected activity; (2) Defendant had knowledge of the protected conduct; (3) Defendant took an adverse employment action against Plaintiff; and (4) "there is a causal connection between the protected activity and the adverse employment action."  *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002).  In addition to its earlier argument that Plaintiff cannot establish an adverse employment action, Defendant argues here that Plaintiff cannot establish the required causal connection between her complaint of racial discrimination to Mr. Lowrey and her alleged constructive discharge.  This Court agrees with Defendant. "To show causation, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct."  *Id.* at 381 (internal quotation marks and citation omitted).  Plaintiff has not done that here.

17

Plaintiff alleges that Ms. DeVos retaliated against her, in violation of Title VII and Michigan's ELCRA, after she made complaints of race discrimination (1) to her immediate supervisor, Ms. DeVos, on February 15, 2008, immediately after the meeting where she was reassigned additional studies; and (2) to Ms. DeVos's supervisor, Alex Lowery, on February 25, 2008, immediately before she was summoned to Ms. DeVos's office and given the ultimatum of either taking on the additional studies or resigning.  As to her complaints to Ms. DeVos on February 15, 2008, Plaintiff testified that:

> A:  We just kind of walked silently down the hallway, but as we got to this court way, which was pretty empty – well, was it was very empty, because we were the only ones in there – I began to speak out about <u>how I felt about being dumped on</u>.
>
> Q:  What did you say?
>
> A:  I told Frances [DeVos] that I didn't feel that it was right that I took on Maria's studies because she hadn't been doing a good job, and I also told her that I bet if I was Maria and did the same thing I'd be fired.
>
> Q:  And what did Frances say?
>
> A:  I told her it was discrimination then.
>
> Q:  You thought it was discrimination because of what?
>
> A:  Because if I was as a black person, Afro-American, were not doing a good job, that somebody else would be required to do my job and I would still keep my job.  Wouldn't have happened like that, like it happened for Maria.

(*Id.* at 103-04 (emphasis added).)  Plaintiff did not testify that she told Frances that she felt she was being discriminated against because of her race.  In fact, Plaintiff testified that the first person she shared that belief with was Mr. Lowrey.  (*Id.* at 201-02.)  As observed by the Sixth Circuit, Plaintiff's general comment to Ms. DeVos about "discrimination" was too vague to constitute protected activity for purposes of a retaliation claim.  *See Fox v. Eagle*

*Distrib. Co., Inc.*, 510 F.3d 587, 591-92 (6th Cir. 2007) (observing that "[a]n employee may not invoke the protections of the Act by making a vague charge of discrimination;" and further observing that to qualify as protected activity, the employee must reference specific acts of discrimination) (internal quotation marks and citation omitted).

On February 25, 2008, Plaintiff took her complaints to Dr. Alex Lowrey.  After getting settled in at work, she immediately went to his office and waited for him to arrive.

Q:  Why did you do that?

A:  Because I was waiting on him to come in to discuss the meeting and the dumping of the studies.

Q:  Okay.  Well, when he came in what did you say to him?

\* \* \*

Q:  What did you say?

A:  That Frances had called an emergency meeting on Friday before I left for my trip, that she had told me that the studies were being removed from Maria because her plate was full, and I was going to be taking them over and asking to help on some.  I told him that I have taken on everybody's work ever since I have been there that has left.  <u>I said I didn't feel that it was fair, I thought it was discriminatory</u>, and I wanted to know why wasn't this work distributed amongst all of us instead of me every time.

(*Id.* at 112-13 (emphasis added).)  Plaintiff later testified that she complained to Mr. Lowrey at this February 25, 2008 meeting that she felt she was being discriminated against because of her race.  She also admitted that this was the first time that she had complained about racial discrimination since moving to the Neurology department.  (*Id.* at 201-02.)

Plaintiff testified that Mr. Lowrey told her that he would talk with Frances DeVos "and find out why [all the reassigned studies] were coming to [her]" and would get back with Plaintiff.  (*Id.* at 113.)  Later that afternoon, Ms. DeVos called Plaintiff to her office.  It is at

this meeting that Plaintiff claims Ms. DeVos constructively discharged her in retaliation for reporting to Mr. Lowrey that she felt she was being singled out for the reassignment of studies because of her race. At her deposition, however, Plaintiff did not testify that she told Ms. DeVos about this protected activity or that Ms. DeVos revealed during their conversation that she was aware of Plaintiff's earlier race-based complaint. Moreover, Plaintiff fails to come forward with any evidence that disputes Ms. DeVos's deposition testimony that Mr. Lowrey did not tell her about Plaintiff's complaint of race discrimination. (DeVos Dep. at 35-39.) Rather, the only evidence is that Plaintiff felt Ms. DeVos was retaliating against her because she went over her head to her boss about the reassignment of studies.

> A: I went in her office. She closed the door. She said I'm very – I spoke with Alex [Lowrey] and I'm very upset with what I heard. She said, first of all, you don't have five new studies. I said yes, I do. She said no, you don't. I said yes, I do. She then – I said why would I have to take on all of Maria's work because she's not doing her job? I've been telling you she hasn't been doing her job for the longest. She said either take it or resign. I said why would I take her studies? And she said oh, you're resigning. I expect your letter of resignation by the end of the day. And I walked out of her office.

(*Id.* at 113-14.) When asked why she felt Ms. DeVos had "retaliated" against her, Plaintiff responded "because I went to her supervisor." (*Id.* at 169, 208.) When asked to elaborate, Plaintiff responded "[b]ecause I went to her boss and made him aware of what was happening to me and I was sent back to her and she fired me." (*Id.* at 170.)[5]

In sum, even if Plaintiff were able to establish a constructive discharge, her claim of retaliation fails because there is no evidence that Ms. DeVos knew of Plaintiff's protected

---

[5]Plaintiff's counsel stipulated at her deposition that the retaliation charge in this lawsuit has nothing to do with her filing an earlier EEOC charge. (Pl.'s Dep. at 225.)

activity before constructively discharging her. *See Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) (observing that a plaintiff cannot establish a *prima facie* case of retaliation absent evidence that "her protected activity was known to those who made" the adverse employment decision).

Finally, even if Plaintiff were able to establish a *prima facie* case of retaliation, her claim still fails because she cannot establish pretext. Forcing an employee to resign when she questions and refuses a supervisor's work assignment is a legitimate, non-discriminatory reason for that employment action. *See Arnold v. Marous Bros. Constr., Inc.*, 211 F. App'x 377, 381 (6th Cir. Nov. 17, 2006) (observing that questioning a work order and refusing to perform had the same effect, and that the employee's refusal of a work order was a legitimate, non-discriminatory reason for the employer to force the employee to resign thus triggering the employee's burden of showing that the employer's action was a mere pretext for race discrimination). Because Defendant stated a legitimate, non-discriminatory reason for its action, the burden shifts back to Plaintiff to present evidence showing that Defendant's stated reason was merely a pretext for retaliation. "The plaintiff must submit evidence that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005) (internal quotation marks and citations omitted). Plaintiff has not met this burden. She presents no evidence that Ms. DeVos did not honestly believe that Plaintiff was choosing to resign rather than accept the additional studies assigned to her in February 2008.

## IV. Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is

GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  February 8, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record
on February 8, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager